**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 26, 2007

GEORGE H. GOLDSTONE,

Plaintiff-Appellant,

v                                         No. 130150

BLOOMFIELD TOWNSHIP PUBLIC
LIBRARY,

Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether Const 1963, art 8, § 9, which states that public libraries "shall be available to all residents of the state," requires each individual public library facility in Michigan to offer nonresident book-borrowing privileges.[1] The lower courts answered this question in the negative, and we agree, although for different reasons. Therefore, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff is a resident of the city of Bloomfield Hills. The city does not have its own public library, but from 1964 to November 12, 2003, had entered into a "library service agreement" with defendant Bloomfield Township Public Library that, for a fee, permitted city residents full access to the library and to other area libraries that were also signatories to the agreement. When the agreement expired in 2003, the city of Bloomfield Hills and the township library did not renew it. As a result, city residents, including plaintiff, were allowed by the township only to visit the library and to use its materials on site. They were not allowed to borrow library materials or to fully access online databases and other programs, services, and activities that were regularly available to township residents.

Plaintiff believed that, notwithstanding the lack of a service agreement between the township library and the city, the Michigan Constitution guaranteed availability to him and to all other state residents. Thus, he felt he had the right to full use of the library and its collections, including borrowing privileges. Plaintiff sought a nonresident library card and offered to pay a borrowing fee. Pursuant to its local policies, the township library refused and asserted that the access it allowed was sufficient to meet the requirements of Const 1963, art 8, § 9.

Plaintiff brought an action seeking a declaratory judgment against the township library, demanding borrowing rights equivalent to those of a township

(…continued)
[1] The term "nonresident" is used throughout this opinion to refer to a person who is a resident of the state of Michigan, but not a resident of the
(continued…)

2

resident on the basis that such rights are assured by Const 1963, art 8, § 9. Anything less, plaintiff argued, such as that which was offered by the township-- library access with no borrowing privileges-- violated the constitutional guarantee. The township library argued to the contrary that, under Const 1963, art 8, § 9, there was no constitutional right to the unlimited access plaintiff sought, and that it could constitutionally enforce its policy.

The trial court granted summary disposition to the township library, ruling that, by allowing onsite use, the library satisfied the constitutional requirement that libraries be "available" to state residents. The Court of Appeals affirmed, agreeing that the availability requirement of Const 1963, art 8, § 9 created no constitutional mandate that libraries provide nonresident borrowing privileges or make all resident services accessible to nonresidents. 268 Mich App 642, 652; 708 NW2d 740 (2005). After hearing oral argument on plaintiff's application for leave to appeal, this Court granted leave to appeal. 477 Mich 919 (2006).

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision granting or denying a motion for summary disposition. *City of Taylor v Detroit Edison Co*, 475 Mich 109, 115; 715 NW2d 28 (2006). Issues of constitutional construction are questions of law that are also reviewed de novo. *Id.* When interpreting constitutional provisions, our primary objective "'is to realize the intent of the

---

(…continued)
municipality having the library from which that person desires to borrow books.

3

people by whom and for whom the constitution was ratified.'" *Studier v Michigan Pub School Employees Retirement Bd*, 472 Mich 642, 652; 698 NW2d 350 (2005), quoting *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). That is, we seek the "'common understanding'" of the people at the time the constitution was ratified. *Studier, supra* at 652, quoting 1 Cooley, Constitutional Limitations (6th ed) at 81 (citations and internal quotation marks omitted). This involves applying the plain meaning of each term used at the time of ratification, unless technical, legal terms are used. *Studier, supra* at 652.

III. ANALYSIS

A. CONST 1963, ART 8, § 9

Const 1963, art 8, § 9 states:

> The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state under regulations adopted by the governing bodies thereof.

Defendant argues that a public library is "available" for purposes of our constitution when it is subject to entry and its resources subject to use on site. We disagree. Instead, we agree with plaintiff that a public library is only "available" when a person enjoys reasonable borrowing privileges. In particular, we agree with plaintiff that, in construing our constitution, "available" must be assessed specifically in conjunction with "public libraries." Although this may not necessarily be true with regard to research libraries or private libraries, we believe

4

that the "common understanding" is that "public libraries" are only "available" to a person if he has reasonable borrowing privileges.[2]

However, we disagree with plaintiff's premise that Const 1963, art 8, § 9 requires that each individual public library facility in Michigan must be "available" on identical terms to all residents of the state. Rather than addressing the obligations of individual library facilities, this provision is better understood, in our judgment, as assuring the availability of public libraries in general.[3] That is, the Legislature shall make public libraries available, not necessarily each individual library facility. Const 1963, art 8, § 9 does not refer to "each and every" public library or to "individual" public library facilities, but refers only to the legislative obligation to provide for the "establishment and support of public libraries." By this use of the plural, as well as the use of the broad terms "establishment and support," we believe that the constitution refers to "public libraries" as an entity, i.e., public libraries as an institution. It is this *entity*, this

---

[2] Although Justice Cavanagh agrees with us that public library "availability" encompasses book borrowing, he criticizes us for not adequately explaining why this is so. *Post* at 3 n 1. Given this view, it is curious that he would provide absolutely no explanation of his own for why he *agrees* with us in this regard.

[3] Justice Cavanagh describes us as holding that as long as libraries are "'generally' available," see, e.g., *post* at 1, art 8, § 9 is satisfied. In so doing, he mischaracterizes this opinion. We do not hold that "general" availability satisfies the constitution. Instead, we hold that "availability" must be understood in terms of the public library as an institution rather than in terms of each individual library facility.

5

*institution*-- the public library-- that must be made "available" to all residents, not

each individual library facility.[4]

---

[4] Justice Cavanagh criticizes us for ignoring the "common understanding" of the ratifiers. See *post* at 7. More accurately, we simply disagree with Justice Cavanagh concerning such "common understanding." He points to nothing occurring at the convention, nothing communicated by the convention, and nothing understood by the people in ratifying the product of the convention that supports his interpretation of the "common understanding." Indeed, much of what Justice Cavanagh cites from the debates, if not altogether irrelevant, affirmatively supports our position. See, e.g., *post* at 10, quoting 1 Official Record, Constitutional Convention 1961, at 822 ("'The committee presumes that legislation may be written so that each library may make reasonable rules for the use and control of its books. . . . [T]o make libraries more available to the people their services may be expanded through cooperation, consolidation, branches and bookmobiles.'"); *post* at 10 n 2, citing 1 Official Record, Constitutional Convention 1961, at 835 ("The committee conveyed that it was the Legislature's place to legislate the details."). Because we believe that the actual language of the proposed constitution constitutes the best evidence of the "common understanding," *Studier, supra* at 652, we rely on this language. Considering this language (as well as the circumstances that necessitated modification of the "library provision" of the constitution, see n 11 of this opinion), we do not believe that the ratifiers understood Const 1963, art 8, § 9 to require each individual library facility to allow each resident of the state to borrow books-- regardless of all other considerations, including the impact of such a policy on communities' incentives to establish and maintain local public libraries.

Justice Cavanagh approvingly cites the amici curiae briefs and affidavits of two former constitutional convention delegates. However, just as this Court is not bound by what individual members of the Legislature subsequently state was the specific intent behind a particular statute, *Bd of Ed of Presque Isle Twp School Dist No 8 v Presque Isle Co Bd of Ed*, 364 Mich 605, 611-612; 111 NW2d 853 (1961), we are not bound by what two of 144 convention delegates state 45 years after the fact was the specific intent behind a particular constitutional provision. Indeed, this stricture is even more true with respect to a constitutional provision than a statute because it is not the intent of the delegates that is controlling, but the intent of the ratifiers-- "we the people."

By way of example, the very same article of the constitution reads, "[r]eligion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Const 1963, art 8, § 1. Such "encourage[ment]" of schools, to continue "forever," does not, we believe, prohibit the cities of Detroit or Saginaw, for example, from ever closing an underutilized or an out-of-date school, for *individual* school facilities are simply not the subject of this provision. Rather, it is schools as an entity, as an institution, that must "forever be encouraged."[5] Likewise, in Const 1963, art 8, § 9, it is not each individual library facility that must be made available, but rather public libraries as an entity or as an institution that must be made available.

And this is precisely what the Legislature has done. Acting pursuant to its constitutional obligation to "provide by law for the establishment and support of public libraries which shall be available to all residents of the state," the Legislature has enacted numerous laws.[6] The premise of these laws appears to be

---

[5] See also Const 1963, art 8, § 8 ("Institutions, programs and services for the care, treatment, education or rehabilitation of . . . [the] disabled shall always be fostered and supported."). Does this provision truly require that no *individual* "institution, program or service" can ever be eliminated or replaced, or does it simply establish a constitutional policy of encouraging such "institutions, programs, and services"?

[6] Justice Cavanagh criticizes us for considering "later-enacted legislation" to modify the meaning of "available." *Post* at 2, 5. More accurately, we look to "later-enacted legislation" as evidence that the Legislature has fulfilled its

(continued…)

7

that the mandate of the constitution can best be achieved by (a) the encouragement of local control of public libraries;[7] and (b) the establishment of a system in which communities with public libraries can enter into agreements with communities without public libraries in order to extend access to such libraries.[8]

---

(…continued)
constitutional obligation to provide for the "establishment and support of public libraries." Ironically, Justice Cavanagh himself looks to both "later-enacted legislation" and "later-issued" Attorney General opinions. *Post* at 15-17.

We agree with Justice Cavanagh that it is not for the Legislature to ultimately determine the meaning of "available" under art 8, § 9. See *post* at 5. Rather, after the Legislature and the governing bodies of the libraries have established rules for availability (as they have done here), the courts must ultimately determine whether what they have done meets the constitutional standard of availability under art 8, § 9.

[7] See MCL 397.206 ("Every [municipal] library . . . shall be forever free to the use of the inhabitants where located."); MCL 397.301 ("any county shall have the power to establish a public library free for the use of the inhabitants of such county . . . with the body having control of such library, to furnish library service to the people of the county"); MCL 397.561a ("A library may charge nonresident borrowing fees to a person residing outside of the library's service area, including a person residing within the cooperative library's service area to which that library is assigned, if the fee does not exceed the costs incurred by the library in making borrowing privileges available to nonresidents including, but not limited to, the costs, direct and indirect, of issuing a library card, facilitating the return of loaned materials, and the attendant cost of administration.").

[8] MCL 397.301 ("any county . . . may contract for the use . . . of a public library already established within the county"); MCL 397.213(1) ("a township, village, or city adjacent to a township, village, or city that supports a free public circulating library . . . may contract for the use of library services with that adjacent township, village, or city"); MCL 397.214(2) ("the library board of directors of a township, city, or village supporting and maintaining a free public circulating library . . . may enter into a contract with another township, city, or village to permit the residents of that other township, city, or village the full use of the library)"; MCL 397.216 ("After fulfilling the contractual requirements, the

(continued…)

8

By these principles-- local control and the encouragement of interjurisdictional agreements-- the Legislature has sought to satisfy its constitutional obligations by incentivizing communities both to build and to maintain libraries, and to extend their availability to communities that lack a library. Had the Legislature acted unwisely in the adoption of these principles, it nonetheless would be entitled to considerable deference from this Court, for it is the Legislature explicitly that has been given primary responsibility by the constitution for the "establishment and support of public libraries." However, it seems clear that the Legislature, with the support of the public library community, has acted wisely.

Justice Cavanagh acts considerably less wisely in seeking to substitute his own judgment for that of the Legislature. He would undo the incentives enacted by the Legislature for the establishment and maintenance of public libraries. He would disincentivize communities from building libraries by making them

---

(…continued)

people of a township, village, or city which has contracted for library services with another township, village, or city shall have all rights in the use and benefits of the library that they would have if they lived in the township, village, or city where the library is established."); MCL 397.555 ("To be eligible for membership in a cooperative library, a local library shall . . . (d) Maintain an open door policy to the residents of the state, as provided by section 9 of article VIII of the state constitution of 1963."); MCL 397.561 ("Following establishment of a cooperative board, residents of the cooperative library's area are eligible to use the facilities and resources of the member libraries subject to the rules of the cooperative library plan. Services of the cooperative library, including those of participating libraries, are to be available at reasonable times and on an equal basis within the areas served to schoolchildren, individuals in public and nonpublic institutions of

(continued…)

identically available to persons who had and who had not paid for them; he would disincentivize communities from maintaining libraries by making improvements and new accessions identically available to persons who had and who had not paid for them; he would disincentivize non-library communities from entering into cooperative agreements with library communities by allowing persons to enter into individual agreements; and he would deprive library communities of the revenues that would be lost as a result of the combination of these disincentives.[9]

---

(…continued)
learning, and a student or resident within the area.").

[9] Indeed, although he skirts the question, Justice Cavanagh, by apparently requiring library communities to subsidize nonresidents entering into individual agreements, would incentivize such agreements while disincentivizing cooperative agreements. He skirts this question by failing to make clear what amount Mr. Goldstone could be required to pay the Bloomfield Township library for his new "constitutional right" of borrowing privileges. Does Justice Cavanagh agree with Delegate Higgs, whom he quotes, *post* at 11-12, that *no* charges at all could be imposed under the constitution for this privilege? Does Justice Cavanagh agree with plaintiff himself that the library could not recoup the "indirect" costs of taxation that are borne by citizens of Bloomfield Township for their library? On these and related questions, Justice Cavanagh uncharacteristically defers to the Legislature to "sort[] out [the] financial details." *Post* at 11. Thus, he avoids addressing what is at the heart of plaintiff's argument, namely that nonresidents are *constitutionally entitled* to identical library privileges as residents, and at a significantly lower cost than borne by residents. That is, nonresidents are entitled to identical library privileges *subsidized by the taxpayers of another community*. This anomalous result is not compelled by Const 1963, art 8, § 9, and further highlights the transformation of state library policy, and the distorted incentives, that Justice Cavanagh would institute.

Justice Cavanagh simply makes no sense on the issue of fees. At one point, he states, "I offer no opinion regarding whether . . . fees are permitted," *post* at 18 n 6, yet at another point, he states, "libraries can protect themselves from the financial ruin the majority predicts simply by exercising their rights to charge a fee
(continued…)

10

As a result, over time, Justice Cavanagh would almost certainly produce an environment in which fewer new libraries are constructed, fewer new books are purchased, fewer cooperative agreements are reached, and local support of public libraries declines. Public libraries would become less, not more, available, although Justice Cavanagh doubtless would take solace that every resident would have absolutely identical access to the dwindling and outworn library resources of the state.

Pursuant to Const 1963, art 8, § 9, it is the Legislature that is empowered to exercise judgments concerning how to "provide by law for the establishment and support of public libraries." Although Justice Cavanagh is free to disregard economic realities and to ignore the logic of incentives and disincentives, the Legislature is not obligated to proceed along these same lines. The Legislature, altogether reasonably we believe, has determined that the "availability" of public libraries is best achieved through the institutions of local control and the encouragement of cooperative agreements. We defer to this judgment.

Indeed, it appears from statistics offered by the Michigan Department of History, Arts, and Libraries that less than 1/5 of 1 percent of the population of

(…continued)
for nonresident book borrowing . . . ." *Post* at 13 n 4. At yet another point, he asserts that it is the "Legislature's place to legislate the details," *post* at 10 n 2, but then criticizes us for commenting on the incentives and disincentives that the Legislature must have weighed in carrying out its constitutional obligation to "provide by law for the establishment and support of public libraries." *Post* at 20.

11

Michigan does not have a public library available either directly through their communities or through a cooperative agreement.[10] This is to be contrasted with the history of the predecessor provision to Const 1963, art 8, § 9, which mandated that the Legislature establish public libraries in every township and city. After 125 years of such a mandate in 1962, a public library had been established in only 7 percent of the cities and townships of Michigan.[11] Particularly against this historical backdrop, the Legislature's judgment that public libraries can best be

---

[10] The department asserts that there are only 21 townships in Michigan with a population totaling 17,055 that do not have a library and that do not contract with another city or township for library services. Inexplicably, the department does not indicate how many cities are similarly lacking. Although we cannot imagine that this figure is very high, Bloomfield Hills obviously is one such city.

[11] In 1963, there were "over a million [Michigan residents that] ha[d] no access to public libraries." Cushman, *Libraries in the proposed new state constitution*, 29 Michigan Librarian 1, 4 (1963).

Perhaps more than anything, it is this hard fact-- the relatively modest success of the predecessor provision in ensuring public library access to the people of Michigan-- that explains the majority's and Justice Cavanagh's different understandings of the significance of the "circumstances" surrounding the ratification of Const 1963, art 8, § 9. Contrary to his assertion, we do not "ignore" these circumstances; we simply interpret them differently than he does. The predecessor provision mandated that the Legislature establish public libraries in every township and city. Justice Cavanagh argues that it is illogical to believe that the citizens of Michigan would willingly give up the constitutional guarantee of a library in their own township or city for a constitutional guarantee of public libraries in general being made available. *Post* at 25. However, the Address to the People accompanying Const 1963, art 8, § 9, observed that the predecessor provision "has never been adhered to as a matter of practice." 2 Official Record, Constitutional Convention 1961, p 3397. We believe that it is entirely "logical" that the people would relinquish an illusory and unrealistic "right" in order to achieve a *reality* of greater library access. And history in this regard has proven

(continued…)

12

made available by encouraging local control and cooperative agreements, and thereby incentivizing their "establishment and support," appears to be an entirely reasonable and responsible judgment that should not be upset by this Court.[12]

## B. OTHER CONSTITUTIONAL ARGUMENTS

Plaintiff also argues that the township library's policy of not offering nonresident book-borrowing privileges violates his First Amendment "right to receive information" under the United States Constitution,[13] and his right not to be deprived of "the equal protection of the laws" under the United States and Michigan constitutions.[14] We disagree.

---

(…continued)
the people right.

[12] Justice Cavanagh presents us with several questions. First, "[o]n what basis is the majority's conclusion reached?" *Post* at 3. Our conclusion is reached on the basis of the language of Const 1963, art 8, § 9, and the circumstances surrounding the change in language from its predecessor provision. Second, "why does the majority rely only on its 'belief' of what the provision means, rather than on its belief of what the people believed it meant?" *Post* at 3-4. What we "believe" the provision to mean and what we believe that the people "believed" it to mean are one and the same and Justice Cavanagh cites nothing to suggest that the people believed it to mean something else or that they had a contrary "common understanding." Finally, "[w]hat exactly *are* 'generally available' libraries?" *Post* at 4 (emphasis in the original). Again, we do not hold that each individual library facility must be "generally available." Rather, we hold that public libraries in general must be available. See n 3 of this opinion.

[13] We must emphasize once again, see n 9, that the right asserted by plaintiff is better characterized as the "right to receive information *subsidized by the taxpayers of another community*."

[14] US Const, Am I; Const 1963, art 1, § 2; US Const, Am XIV.

Plaintiff cites four cases to support his argument that the township library's policy of not offering nonresident book-borrowing privileges violates the First Amendment. The first case-- *Martin v City of Struthers,* 319 US 141; 63 S Ct 862; 87 L Ed 1313 (1943)-- held that a municipal ordinance that prohibited people from knocking on doors to distribute leaflets violated the First Amendment. The second case-- *Griswold v Connecticut,* 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965)-- held that a state statute prohibiting the use of contraceptives violated the right of marital privacy. The third case-- *Kreimer v Morristown Bureau of Police,* 958 F2d 1242 (CA 3, 1992)-- held that a public library's rule prohibiting disruptive behavior and offensive bodily hygiene did not violate the First Amendment. The fourth case-- *Salvail v Nashua Bd of Ed,* 469 F Supp 1269 (1979)-- held that a school board's removal of a certain magazine from the library based on its content violated the First Amendment. First, we must note that we are, of course, not bound by either *Kreimer* or *Salvail*. *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004). Second, and most importantly, not one of the cases that plaintiff cites held, or even remotely suggested, by implication or otherwise, that the First Amendment requires a public library to offer nonresident book-borrowing privileges.

The most relevant case cited is *Kreimer, supra* at 1255, which merely held that the First Amendment protects "the right to some level of access to a public library." In this case, the township library indisputably allows nonresidents "some level of access to a public library." Therefore, even under *Kreimer*-- the most

14

relevant and the most favorable case that plaintiff has cited in support of his argument, although we emphasize again not a case that is controlling or that has been adopted in this state-- it is clear that a township library's policy of not offering nonresident book-borrowing privileges does not violate the First Amendment.

Plaintiff's equal protection challenge likewise fails. Plaintiff alleges no discrimination here based on race, national origin, ethnicity, gender, or illegitimacy. Accordingly, this Court applies a "rational basis" analysis.[15] See, e.g., *Crego v Coleman*, 463 Mich 248, 259-260; 615 NW2d 218 (2000). Under such an analysis, "courts will uphold legislation as long as that legislation is rationally related to a legitimate government purpose." *Crego, supra* at 259. In order to have a law declared unconstitutional, a challenger must demonstrate that it is arbitrary and that the law is "'wholly unrelated . . . to the objective of the statute.'" *Id*., quoting *Smith v Employment Security Comm*, 410 Mich 231, 271; 301 NW2d 285 (1981). No showing of this sort is possible here. The purpose of the township library's residency requirement is to create a viable means of establishing and maintaining a local public library; it is a means consistent with the Legislature's constitutional direction to make public libraries available to the residents of this state. For the reasons discussed in this opinion, the library's

regulations are a reasonable way to achieve its purpose, and, thus, there is no equal protection violation.

### IV. CONCLUSION

Const 1963, art 8, § 9 does not require each and every individual public library facility in Michigan to offer nonresident book-borrowing privileges. Accordingly, we affirm the Court of Appeals decision affirming summary disposition for the township library.

Stephen J. Markman
Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.

---

(…continued)

[15] The rules governing the interpretation of statutes apply with equal force to the interpretation of local ordinances. See, e.g., *Gora v City of Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998).

STATE OF MICHIGAN

SUPREME COURT

GEORGE H. GOLDSTONE,

      Plaintiff-Appellant,

v                                             No. 130150

BLOOMFIELD TOWNSHIP PUBLIC
LIBRARY,

      Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

      Imposing a bizarre semantical construct on Const 1963, art 8, § 9, and ignoring the circumstances surrounding its ratification, the majority's decision in this case divests Michigan citizens who reside in a town that does not have a library of their constitutional right to borrow books from other libraries. Despite the clear mandate from the people of this state that libraries "shall be available to all residents of the state," Const 1963, art 8, § 9, the majority decides that as long as libraries are "generally" available, the constitutional obligation is fulfilled. The majority accomplishes this through an unusual analysis that fails to account for the history of and purpose behind the constitutional amendment. In doing so, the majority attributes a trade-off to the people of this state that the people did not make. Thus, I dissent.

To obtain a true understanding of what the constitutional language means and how it must be enforced, one must actually consider the people's understanding of what it meant to have our libraries "available," for it is the people's understanding of the amendment at the time they ratified it that governs the analysis. One cannot, as the majority does, *ante* at 7-13, consider concerns that may have arisen later or that exist today, such as policy issues or hypothetical financial considerations. Nor may we look to other constitutional provisions or later-enacted legislation as clues to the amendment's meaning. See *ante* at 7-8. Rather, the people's understanding is properly evaluated in a way we have explained as follows:

> In interpreting the constitution, this Court has developed two rules of construction. First, the interpretation given the constitution should be "the sense most obvious to the common understanding"; the one which "reasonable minds, the great mass of people themselves, would give it". *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971); *Council No 11, AFSCME v Civil Service Comm*, 408 Mich 385, 405; 292 NW2d 442 (1980) (quoting Cooley's Const Lim [6th ed], p 81). Secondly, "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished may be considered". *Traverse City School Dist*, 384 Mich 405. See *Kearney v Board of State Auditors*, 189 Mich 666, 673; 155 NW 510 (1915). [*Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 745; 330 NW2d 346 (1982).]

Although the majority acknowledges the existence of this standard, *ante* at 3-4, and at least purports to apply it to conclude that the people understood

2

libraries to be lending institutions,[1] the majority makes no further mention of these principles as it proceeds to decide how the concept of "availability" must be interpreted. Thus, the majority reaches the unexplained (and inexplicable) conclusion that the people intended that libraries would "in general" be available.

The majority's core analytical misstep occurs *ante* at 5-6, where it states,

> However, we disagree with plaintiff's premise that Const 1963, art 8, § 9 requires that each individual public library facility in Michigan must be "available" on identical terms to all residents of the state. Rather than addressing the obligations of individual library facilities, this provision is better understood, in our judgment, as assuring the availability of public libraries in general. That is, the Legislature shall make public libraries available, not necessarily each individual library facility. Const 1963, art 8, § 9 does not refer to "each and every" public library or to "individual" public library facilities, but refers only to the legislative obligation to provide for the "establishment and support of public libraries." By this use of the plural, as well as the use of the broad terms "establishment and support," we believe that the constitution refers to "public libraries" as an entity, i.e., public libraries as an institution. It is this *entity*, this *institution*—the public library—that must be made "available" to all residents, not each individual library facility.

I must echo what every reader must now be thinking: "What?" On what basis is the majority's conclusion reached? And why does the majority rely only on its "belief" of what the provision means, rather than on its belief of what the people believed it meant? What exactly *are* "generally available" libraries? The authority on which the majority's conclusion is drawn is glaringly absent.

---

[1] Although I agree with the majority that the common understanding of the term "public library" at the time of ratification was that of an institution from which books could be borrowed, I note that the majority appears to divine that meaning from thin air rather than discuss how it may have reached it.

(continued…)

3

I fail to see the relevance of the other constitutional provisions the majority proffers to support its conclusion. The people's intent with respect to Const 1963, art 8, § 9, is not assessed by reference to Const 1963, art 8, § 1, a provision regarding "schools and the means of education," or Const 1963, art 8, § 8, a provision regarding institutions, programs, and services for the disabled. Moreover, the majority's attempt to analogize the three provisions is a stretch so thin it defies credibility. And the majority should review Const 1963, art 8, § 2, which states in part, "The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law." Under the majority's rationale, this provision would mean that schools should be "generally available," but would stop short of guaranteeing that every student has a right to have a school fully available to him. Further, Const 1963, art 8, § 1, is a general statement that espouses the importance of education in general, while the subsequent provisions of article 8, such as § 2 (schools) and § 9 (libraries), detail the specific means by which education will be promoted.

The majority's subsequent orations on library funding issues are not only irrelevant to the analysis, but they also demonstrate a critical misunderstanding of the issue at hand. The majority fails to grasp that the interpretation of "available" is not subject to post-ratification whims of the Legislature, courts, or governing

---

(…continued)

4

boards of libraries. It is not the Legislature's province to determine "that the 'availability' of public libraries is best achieved through the institutions of local control and the encouragement of cooperative agreements." *Ante* at 11. Rather, the meaning of the term "available" was set when the people ratified Const 1963, art 8, § 9, and that meaning is not now modifiable. Under the clear language of the constitutional provision, the Legislature is to enact laws that "establish" and "support" public libraries, which libraries must be "available" to all people. Nothing in the language allows any entity to alter the meaning of "available" or govern its scope after the fact. Moreover, we are not to determine what meaning of "available" makes the most sense today, as the majority prefers to do, but how that term was understood in 1963.

Rather than being charged with determining what it means to have libraries available, the constitutional provision requires the Legislature to enact laws that *establish* our public libraries and to develop ways in which those libraries can be *supported*, while the local library boards may promulgate regulations relating to the logistical and administrative tasks intrinsic to running a library, including the process for lending books to nonresidents who are not otherwise covered by a cooperative agreement. Const 1963, art 8, § 9; see also OAG, 1983-1984, No 6,188, p 195 (October 17, 1983). The distinction, though fine, and though missed by the majority, is material. Local library boards may adopt rules that assist them with administering the libraries in the process of

5

making them "available." For instance, local library boards might regulate the number of books that can be borrowed at one time, the cost of borrowing fees, or the length of time a book can be borrowed. Similarly, library boards can regulate the use of their meeting rooms, the length of time one can use a computer, or the hours the library will be open. They cannot, however, impede the fundamental principle of "availability" as that term was understood when ratified.

Thus, we must determine what sense of the "availability of libraries" was most obvious to the common understanding of the great mass of the people of this state. *Soap & Detergent*, *supra* at 745. Having conducted my own inquiry into the people's intent, I agree with the majority that the understanding most common to the people was that libraries were lending institutions. But the analysis cannot end there; rather, we must also examine the "'circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished,'" *Soap & Detergent*, *supra* at 745, quoting *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), to reach an understanding of what it meant to the people to have these lending libraries "available." Although such an analysis would lead to the conclusion that the people ratified a constitutional provision that would do more than promote some ethereal sense that lending libraries would "in general" be available, whatever that might mean, the majority blatantly ignores the people's understanding and in fact, as noted, makes no inquiry into it whatsoever.

6

In construing the meaning of a constitutional provision with the ultimate goal of discerning the people's intent, "the technical rules of statutory construction do not apply." *Traverse City School Dist*, *supra* at 405, citing *McCulloch v Maryland*, 17 US (4 Wheat) 316, 407; 4 L Ed 579 (1819). Further,

> "it is not to be supposed that [the people] have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding*, and ratified the instrument in the belief that that was the sense designed to be conveyed.'" [*Id.*, quoting Cooley, Constitutional Limitations, p 81 (emphasis in original).]

The majority's theory about "general availability" and plural and singular word forms are hypertechnical conclusions that run roughshod over the principle explained by Justice Cooley. The majority's interpretation *is* both a dark *and* abstruse meaning that is quite opposite to the sense most obvious to the common understanding. At the time this amendment was ratified, in the face of language that read, "The legislature shall provide by law for the establishment and support of public libraries which shall be available to all residents of the state . . . ," the people of Michigan certainly did not understand that language to convey an indeterminate promise that libraries would "in general" be available, which, in the majority's view, means merely that some library somewhere in the state must lend books. Rather, basic common sense dictates that this wording guaranteed *actual* availability of libraries to all people in the sense that each library would be available for each citizen's use. Indeed, the people ratified a constitutional

7

provision that mandated the availability of lending institutions to "*all citizens*," not "some citizens" or just citizens who are under a library service agreement.

The majority's declaration that when ratifying the constitutional amendment, the people believed they were ratifying a provision that would replace their indelible right to full library access with an impotent "right" to have the availability of libraries "generally" encouraged, almost hints of a shell game. Moreover, the majority violates a cardinal rule of construction by adding words to the provision. Rather than seek the dark or abstruse meaning, or assume that the people parsed the language and came to this agreement on its grammar, syntax, and semantics, I would heed the axiomatic principles that guide us in determining the meaning behind a constitutional provision. The *commonsense* meaning must be imposed, and the circumstances surrounding the amendment must be examined.

I must note the irony of the majority's conclusion that the citizens would have understood libraries to be lending institutions, which is clearly a commonsense interpretation, contrasted with its peculiar conclusion that the people would have understood "availability" as a term that did not guarantee availability to each citizen, which is clearly not a commonsense interpretation. The majority swings twice but hits only once.

Having discussed the commonsense meaning behind the provision, which, in my view, is easily detectable, I turn now to the circumstances that existed

during the time the constitutional provision was proposed and ratified. The circumstances surrounding the promulgation of article 8, § 9, were captured in the record made of the discussion and debates about the constitutional amendment at the constitutional convention. Before the 1963 constitutional amendments were ratified, the previous constitution required each Michigan township and city to maintain at least one public library. Const 1908, art 11, § 14. Sparking the committee on education's proposed revisions to that mandate was the reality that many townships and cities were not maintaining a public library, mostly for financial reasons. Thus, the delegates sought to relieve townships and cities of the burden of maintaining a library while still preserving the right of the people to access a library. See, generally, 1 Official Record, Constitutional Convention 1961, pp 822-837.

Of paramount concern, as reflected in the transcript of the convention debate, was library funding. Delegates discussed at length the necessity of allowing the Legislature to promulgate regulations that would promote the economic feasibility of reducing the required number of libraries while increasing the number of citizens who may use the libraries. Delegate Alvin M. Bentley, chairman of the committee on education, thoroughly explained that while the time had come to transition from the original constitutional mandate, the new constitutional mandate would not only preserve, but increase, library availability:

> This section continues the fine Michigan tradition of encouragement and support of public libraries throughout the state,

9

but it does attempt to eliminate some of the confusing elements of the present article XI of section 14. The 1908 constitution states: "The legislature shall provide by law for the establishment of at least 1 library in each township and city; . . ." This has never been adhered to as a matter of practice. Today, only 1 out of 15 townships has a library.

The present language emphasizes that "public" libraries will be "available" to residents without fixing how or where the libraries themselves shall be organized. The committee presumes that legislation may be written so that each library may make reasonable rules for the use and control of its books.

Under this proposal present libraries will be retained. But to make libraries *more available to the people* their services may be expanded through cooperation, consolidation, branches and bookmobiles. [1 Official Record, Constitutional Convention 1961, p 822 (emphasis added).]

With financial concerns at the forefront, the scope of privileges that would be afforded to nonresidents using another municipality's library was thoroughly explored during the debate.[2] Most delegates were clear that the citizens in towns

_____

[2] Defendant argues that had the intent behind the constitutional amendment been to require all public libraries to offer all services to all people, the provision would have explicitly detailed the inner workings of the new library system. But the committee on education was strongly against including any specificity in the constitutional language for the good reason that it was the constitution. The committee delegates strove for brevity, something they specifically discussed during the convention debates. The committee conveyed that it was the Legislature's place to legislate the details. See 1 Official Record, Constitutional Convention 1961, p 835 ("[T]he committee believed that this provision should be in this respect as broad and general in scope as possible. . . . [O]bviously we recognize that there must be qualifications, there must be reservations, there must be individual problems which must be met. And I submit that we cannot and we should not try to meet them in this constitution. Let's leave that up to the legislative and statutory action."). For obvious practical reasons, the delegates chose not to expound endless details about the library system in the constitutional language.

with libraries should not be required to subsidize the costs of nonresidents using their libraries, but, prudently, they left the sorting out of financial details to the Legislature.[3] ("*The legislature shall provide by law for the establishment and support of public libraries* which shall be available to all residents of the state under regulations adopted by the governing bodies thereof." Const 1963, art 8, § 9 [emphasis added].)

But not all delegates were convinced that the question of cost-based library use was open on the face of the amendment's language. Delegate Milton E. Higgs, for example, questioned whether the constitutional language meant not only that making libraries available to all citizens meant that all citizens could borrow books, but that no charge could be assessed for the privilege:

> I would say that when you say "which shall be available to all residents of the state" in the constitution, that you could not limit or qualify that in any way by the requirement of a deposit for the use of the book to guarantee its return or anything else. You say "It shall be available to all residents of the state." This is like saying in a criminal case, "You've got a right of appeal." When you say, "You've got a right of appeal," you've got that right whether you've got the money to pay for it or not. In fact, if you don't have the money to pay for it, the county has to provide it in that case, and I say in this case the same thing would apply." [1 Official Record, Constitutional Convention 1961, p 836.]

Indeed, the debate centered primarily on how libraries would be funded under the new language and whether nonresidents would or could be made to pay

---

(continued…)

11

for using the services, including book lending, of libraries in other municipalities, not on whether nonresidents could borrow books at all. In fact, when the topic of book borrowing was broached, delegate Karl K. Leibrand expressed concern that providing a free "full time library service [to nonresidents], with the circulation of books, [would be] an undue burden." 1 Official Record, Constitutional Convention 1961, p 834. In response, the chairperson of the subcommittee on libraries of the committee on education, delegate Vera Andrus, explained that contracts between municipalities were one solution to that concern and that the language of the proposed amendment "doesn't say free." *Id.* at 835. Elsewhere in the dialogue, delegate Bentley asked, "[A]s long as a person from any part of the state can come up to your library and conform with your local regulations and rules, he can have that library and its services and its books made available to him. Would you say that that was covered?" *Id.* at 836. Delegate Higgs responded, "I would say that would be covered." *Id.*

These passages and the balance of the debate on the proposal quite clearly evidence that the key concern was, given that library services must be made available to all citizens, how the libraries would pay for the increase in use. As is also clear, the unanimous resolution of that question was to engraft onto the

(…continued)
[3] I must correct the majority. It is not *I* who am leaving these details to the Legislature, *ante* at 10 n 9; it is the *people of Michigan* who left these details to the Legislature by ratifying a constitutional amendment that said precisely that.

12

constitutional amendment a grant of authority for the Legislature to promulgate laws that would provide for this support. But the assumption was that library services, free or not free, would be fully available to all citizens.[4] *Glaringly absent from the debate is any proffering of the idea that Michigan residents would be unilaterally deprived of the right to borrow books if they live in a community without a library.*

In fact, two delegates who were present during and participated in the constitutional convention debates have appeared before this Court as amici curiae to share their recollections of how the proposed constitutional amendment was commonly understood at that time. And in our quest to ascertain the meaning behind the constitutional provision, their thoughts are enlightening and beneficial.[5] Former delegates Tom Downs and Milton Higgs have averred to this Court that the constitutional provision was intended, and was commonly understood, to mean that "the words, 'available to ALL RESIDENTS OF THE

---

[4] Although I cannot emphasize enough that the financial intricacies of our public library system are the Legislature's domain, the majority grievously errs by blinding itself to the fact that libraries can protect themselves from the financial ruin the majority predicts simply by exercising their rights to charge a fee for nonresident book borrowing that fully reflects the cost of that service. MCL 397.561a.

[5] Not to the majority, however, which readily tosses aside the insights of these former delegates. See *ante* at 6 n 4. It must be irrelevant to the majority that the statements of the former delegates today are consistent with what they said at the convention 45 years ago.

13

STATE,' included borrowing books during days and hours the library would normally be open to the public." Affidavit of Milton E. Higgs, May 25, 2006. Higgs further explained that "it was commonly understood by the delegates that some libraries required a nominal fee for a nonresident of the district reflecting costs . . . ." *Id.* And Higgs shed further light on the meaning of the phrase "under regulations adopted by the governing bodies thereof." He pointed out that those words

> were added to committee proposal 31 during the floor debate to allow some flexibility to the word "available" understanding that such regulations be reasonable and that county law libraries although available to the public would be free to continue the practice of limiting circulation of its books so that they would be immediately available for the judge, the lawyers, and the litigants having business with the court when needed. [*Id.*]

Downs has the same recollections from his participation in the constitutional convention. He recalls "[t]hat the common understanding expressed by the delegates was that the purpose of Article VIII was to insure ready access to the means of education by all citizens of Michigan regardless of area of residency" and that the provision "required public libraries to permit all state residents to borrow books regardless of area of residency." Affidavit of Tom Downs, May 5, 2006. Forty-five years later, both gentlemen agree with what seems clear from the transcript of the constitutional convention debates: the intent behind the constitutional provision was to enlarge citizens' access to libraries by allowing citizens to use any library in the state and to obligate the Legislature to provide funding for this system.

14

And the Legislature promptly did address funding matters by enacting a series of regulations that established mechanisms through which adequate funding could be achieved. Probably the most significant of the Legislature's solutions to the new library system's financial challenges was the State Aid to Public Libraries Act (SAPLA), former MCL 397.501 *et seq.*, passed in 1965. In the push for the passage of that bill, the Michigan Library Association's president exhorted the members to continue with the association's "major effort" toward its "top priority concern with its basic objective: *good* library service easily available to every citizen of Michigan." Purdy, *The president comments*, 29 Michigan Librarian 1, 1 (1963). The president identified the funding proposal as a "concrete, practical step toward such universal access[.]" *Id.* In fact, the president credited the association's "rural and small town" members for the passage of the preceding library funding bill of 1937, stating that those members impressed upon the Legislature that they "*wanted* good library service and *demanded* that the State accept its share of the responsibility for seeing that they got it." *Id.* at 2. This is yet additional evidence of the emphasis that was placed on the availability of full library services to all Michigan citizens, even those in rural areas whose towns could not afford their own libraries.

Amended several times since, the SAPLA is now codified at MCL 397.551 *et seq.* The SAPLA encourages townships and cities to create coordinated library systems by establishing cooperative library plans. These

15

cooperative plans enable townships and cities to enter into contracts wherein a town without a library pays financial consideration to a town with a library so that the first town's residents can use the library of the neighboring town. See, e.g., MCL 397.555. Undoubtedly, these cooperative agreements ease the financial burden of allowing nonresidents to use the public library of another town or city.

Not every city and township without its own library, however, would establish a cooperative agreement with another town. So the parameters of a person's ability to use another town's library when residing in a town with neither a library nor a cooperative agreement also had to be addressed. When the question regarding the right of a library to refuse service to a nonresident first arose, Attorney General Frank Kelley was asked whether Const 1963, art 8, § 9, affords nonresidents full use of any public library. In light of the language and history of the constitutional provision, the Attorney General sagely concluded that

> all public libraries and their facilities shall be available for use by all state residents, subject to reasonable rules governing the use and control of the library facilities. Clearly, under the constitutional mandate, and the Convention debates, *supra*, the right of state residents to use the facilities of any public library includes not only the right to enter a public library and read books there, *but the same right to borrow books that is offered to residents of the community in which the library is established subject to reasonable regulations . . . .*
>
> *The framers of Const 1963, art 8, § 9, supra, did not intend to create, or perpetuate, a library system where library privileges are*

16

*not provided to state residents on an equal basis.* [OAG, 1979-1980, No 5,739, p 874 (July 15, 1980) (emphasis added).]

Subsequently, after another lengthy analysis of the plain language of the constitutional amendment and the purposes surrounding the amendment as reflected in the convention debates, the Attorney General explained that the fees to borrow books that are charged to a nonresident who is not covered under a cooperative agreement must reasonably reflect the costs incurred by the library in making those privileges available and that the costs must be proportionate "to the cost, direct and indirect, of issuing a library card, facilitating the return of loaned books, and the attendant cost of administration." OAG, 1983-1984, No 6,188, p 203. This opinion prompted the Legislature to codify the Attorney General's pronouncements as follows:

> A library may charge nonresident borrowing fees to a person residing outside of the library's service area, including a person residing within the cooperative library's service area to which that library is assigned, if the fee does not exceed the costs incurred by the library in making borrowing privileges available to nonresidents including, but not limited to, the costs, direct and indirect, of issuing a library card, facilitating the return of loaned materials, and the attendant cost of administration. [MCL 397.561a.]

The Attorney General's conclusions about the focus of the constitutional convention debates match my own. And the series of events that occurred after Const 1963, art 8, § 9, was ratified demonstrates the consistency with which the meaning of the provision has been understood for more than 40 years. Beginning with the committee on education's explanations at the constitutional convention and spanning numerous legislative enactments and three attorney general

17

opinions, the unified understanding was and has been that Const 1963, art 8, § 9, allows any Michigan citizen to borrow books from any Michigan public library. To address the resulting fiscal concerns and, thus, protect the libraries' financial integrity, the Legislature promptly authorized local library boards to assess fees for that privilege.[6]

But despite the categorical evidence that the intent behind the provision was to continue to make libraries *fully available to all* while removing the burdensome requirement that every township and city maintain a public library, *and the striking absence of any evidence to the contrary*, the majority decides with the flick of a pen that a citizen without a public library in his town is at the mercy of each individual library across the state with respect to whether he can

---

[6] Curiously, plaintiff does not argue what the majority attributes to him. The majority states that plaintiff argues that he is entitled to the "borrowing rights equivalent to those of a township resident" and that "[a]nything less, . . . such as that which was offered by the township—library access with no borrowing privileges—violated the constitutional guarantee." *Ante* at 2-3. To the contrary, plaintiff fully accepts that the constitutional language allows defendant and local library boards to charge him a nonresident book borrowing fee pursuant to MCL 391.561a. And in his efforts to borrow books from defendant, he offered to pay a fee accordingly. (Because plaintiff does not challenge the Legislature's authority to allow such fees, I offer no opinion regarding whether such fees are permitted by the Constitution. Moreover, I believe such a discussion would be imprudent because that issue is not presented in this case, so I will not be baited into that discussion by the majority. See *ante* at 10-11 n 9. And while it should not be necessary, I will assist the majority by pointing out that questioning whether nonresident book borrowing fees may be unconstitutional is not inconsistent with my recognition that the statute does indeed permit them. See *ante* at 10-11 n 9.)

18

check out a book. Under the majority's "rationale," as long as some library somewhere in the state allows book lending, that is close enough.[7]

And the majority's philippic response to this dissent entirely ignores that the Legislature has given libraries the authority to assess fees for nonresident book borrowing that reflect the direct and indirect costs of that practice. MCL 391.561a. But even so, the majority's attention to the purported financial ramifications of nonresident book borrowing *is not the concern of this Court*. The debate over funding was had, quite thoroughly in my opinion, at the constitutional convention, and the decision was made to place the responsibility for funding fully available libraries squarely in the hands of the Legislature.

The majority seems to be suggesting that nonresident book borrowing would bankrupt the entire library system and compel all public libraries into a downward spiral of decrepitness and decay that will culminate in crumbling buildings and dusty old dog-eared collections that nobody wants to read. See *ante* at 9-11. I refuse to credit such thespian antics. The Legislature has an

---

[7] Contrast the majority's conclusion that the constitution ensures only the availability of libraries "in general" with its statement that it is "entirely 'logical'" that the people ratified the provision "to achieve a reality of greater library access." *Ante* at 12-13 n 11 (emphasis omitted). I fail to see how a belief that the people were attempting to achieve a reality of *greater library access* is consistent with the conclusion that the constitution guarantees the people nothing more than the existence of a book lending library somewhere in the state. Moreover, the majority could not be more wrong that "history in this regard has proven the people right" after today's decision. See *ante* at 13 n 11.

obligation to ensure that the libraries the public has a right to have available are adequately supported. If financial struggles ensue, the Legislature is more than equipped to deal with them, and the people of this state are more than equipped to handle their concerns through the democratic process. Similarly, if the people's choice to require the full availability of libraries was fiscally unwise, its correction "is not a judicial function, but rather 'must be left to the people and the tools of democracy: the "ballot box, initiative, referendum, or constitutional amendment."'" *People v Maffett*, 464 Mich 878, 895; 633 NW2d 339 (2001) (Corrigan, J., dissenting), quoting *People v McIntire*, 461 Mich 147, 159; 599 NW2d 102 (1999), citing *Dedes v Asch*, 446 Mich 99, 123-124; 521 NW2d 488 (1994) (Riley, J., dissenting). See also *Michigan United Conservation Clubs v Secretary of State*, 464 Mich 359, 389; 630 NW2d 297 (2001) (Corrigan, J., concurring); *Robinson v Detroit*, 462 Mich 439, 474; 613 NW2d 307 (2000) (Corrigan, J., concurring). This Court has no place "incentivizing," "disincentivizing," or otherwise engaging in any policy decisions with respect to financing. See *ante* at 9-10 and n 9. In fact, "ignor[ing] the logic of incentives and disincentives," as I am accused of doing, *ante* at 11, is to interpret the constitutional language as written and to avoid engaging in judicial activism.

Moreover, it is the majority who now gives the green "incentivization" light for library boards to politicize their accessibility by creating regulations that reach far further than merely preventing nonresident book borrowing onsite. For

20

example, when Bloomfield Township and the city of Bloomfield Hills could not agree on a price for the renewal of their library service agreement,[8] which failure resulted in city of Bloomfield Hills residents' loss of borrowing and other privileges at defendant library, defendant commanded a "reciprocal agreement" with *90 other libraries* in which those libraries agreed not to lend books to any city of Bloomfield Hills resident. Thus, despite that plaintiff was issued a MichiCard[9] from the Pontiac Public Library, he was refused book borrowing privileges at the Baldwin Public Library and the West Bloomfield Public Library, even though both libraries belong to the network of libraries accepting the MichiCard. Those libraries informed plaintiff that under their agreement with defendant, they "cannot furnish borrowing services to Bloomfield Hills city residents unless they have a valid card from the Bloomfield Township Public Library." The majority allows this to continue, foisting on our citizens a public library system that is subject to calculated measures to deprive plaintiff and

---

[8] Defendant declined during discovery to provide information about the costs of providing library services to nonresidents; thus, it is impossible to comment about the fairness, or lack thereof, of the price it demanded from the city of Bloomfield Hills in the contract renewal negotiations. But for the interested reader, the city had been paying $226,460 annually, and the township asked for $463,550 annually in the contract that failed.

[9] The MichiCard is a statewide library card that allows holders of the card to use the services, including book borrowing, of any participating library in the state. Participating libraries are reimbursed by the state for postage costs incidental to shipping books to patrons, as well as the replacement costs of items that are not returned.

21

others like him of the full use of libraries. Surely this is not what our citizens envisioned when they ratified a constitutional amendment that was to broaden library availability. Indeed, to plaintiff, who is now denied book borrowing privileges by 90 libraries, libraries are "generally *not* available."[10]

It should be borne in mind that the proposed constitutional amendment did not represent a marked change in existing practices. Before the ratification of Const 1963, art 8, § 9, Michigan citizens enjoyed the right to fully and freely use the public library in their town. No new rights were created by the adoption of the constitutional amendment; there was simply a shift in how access to a library would be afforded. Delegate E. L. Cushman shared her thoughts on the impact of the constitutional provision with the Michigan Library Association in an article entitled *Libraries in the proposed new state constitution*, 29 Michigan Librarian 4, 4-5 (1963):

> Michigan differs from most states in that libraries have been mentioned in our constitutions from the first in 1835 through the 1850 document down to the present one of 1908.[11]
>
> The proposed new constitution of 1963 continues and strengthens this tradition. The new wording accomplishes several things:

---

[10] In fact, not only can plaintiff not borrow books from defendant, defendant also refuses to allow plaintiff to use the Internet at the facility. And while nonresident children can use the Internet in the "Youth Room," they are denied remote access to the system.

[11] I proudly note that Michigan citizens were the first in the nation to bestow upon themselves a constitutional right to access a library.

The addition of the word "support" "acknowledges the growing need for statewide support for public libraries" . . . . While this need has been recognized by the legislature, the new wording gives it increased emphasis.

The new language recognizes the need for libraries available to all residents of Michigan, whereas now over a million have no access to public libraries.[12]

\* \* \*

In brief, the new constitution continues the present systems of organization and financing, while placing increased emphasis on state support of libraries and on the need for statewide library services.

Thus, instead of guaranteeing that the library a person could access would be in that person's town, the constitutional amendment guaranteed that all libraries would be available to all people. The notion of "availability"—and the attendant rights—remained constant. There is simply no basis on which to conclude, and the majority provides none, that the people of this state understood or agreed that the constitutional amendment meant that libraries would be "generally" available, or that as long as some libraries are fully available to some people, the constitutional mandate is fulfilled.

As defendant itself recognizes, "Clearly, as was set forth in the Address [to the People], the delegates intended for existing libraries *to fill the void in service* created by the failure of so many local communities to build their own libraries." (Emphasis added.) In lieu of requiring all townships and cities to

23

provide a library to their residents, the revision would "fill the void" by requiring *all* libraries to be available to all citizens. The provision was a replacement of a system that, while not working as intended, allowed all residents the full use of a library. The revision was intended to fix what was broken, not to remove from the citizenry the full use and enjoyment of libraries. And the intent behind the revision was clearly reflected in the convention debates and has been manifested by the legislative promulgation of regulations that allow the new system to work.

The majority trivializes the importance of the constitutional convention debate and incorrectly characterizes its content. *Ante* at 6 n 4. The majority states that it prefers to look to the "actual language" of the constitution rather than at how the delegates were discussing and describing its meaning. *Ante* at 6 n 4. But what the delegates understood the proposed constitution to mean has critical importance because it was their understanding that was then conveyed to the people in an effort to educate the people about the proposed amendments before the people voted on it in April 1963. In other words, the people derived their understanding of the constitutional language from what was written by those participating in the constitutional convention. So the explanation provided to the people was premised on the delegates' understanding after having participated in

---

(…continued)

[12] Curiously, the majority cites the statistic mentioned in this sentence, *ante* at 12 n 11, but ignores the context in which the statistic was used—namely, to emphasize the need to make libraries *fully available to all people*.

the framing of the new text. It should come as no surprise, then, that the publication *What the Proposed New State Constitution Means to You*, written by the delegates and circulated to Michigan citizens, explained that "[t]he proposed new language emphasizes that 'public' libraries will be 'available' to residents without fixing how or where libraries shall be organized." *Id.* at 81. The publication states nothing about the proposed language guaranteeing only "general" library availability.[13]

The majority's "generally available" theory has no basis in fact or logic and requires the belief that the citizens of Michigan willingly gave up the guarantee of a free, community-based, fully accessible library for the unknown of a possibly cost-based, possibly distant library that would have the authority to severely restrict usability. It requires one to accept that the people gave up not only their right to have a free library in their town, but also the right to borrow books from *any library*. This conclusion is incredible both as a basic premise and when viewed in the historical context of the constitutional amendment.

---

[13] I can locate nothing from any other organization attempting to educate its members about the proposed constitutional changes that conveys a contrary understanding. Rather, the people of Michigan were being informed that the constitutional amendment *expanded* library service. For example, the brochure circulated by the League of Women Voters informed the League's members that "[p]rovisions for the handicapped and for libraries are broadened. . . . The legislature is called on to provide for establishment and support of libraries 'available to all residents'." *It's Your Choice: The 1908 or the 1963 Constitution*, The League of Women Voters of Michigan, November 1962, p 16.

In 1963, when asked to ratify a constitutional amendment that would relieve communities of the burden of maintaining a library in exchange for ensuring that all libraries would be "available" to all people, the people of Michigan spoke. Pointlessly, the majority's refusal to engage in a comprehensive attempt to understand that voice divests the citizenry of a right it gained through reasoned compromise. What was a practical and calculated exchange of rights at the time is lost today through imposing on clear language an amorphous postulation that is unsupported by both common sense and history.

Article 11, § 1, of the 1908 Constitution, existing today as Const 1963, art 8, § 1, reads as follows: "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." At the constitutional convention, delegate Harold E. Bledsoe expressed alarm that the inherent purpose of promoting library availability to Michigan citizens was becoming overshadowed by some quibbling about the potential differences between city library funding and county and township library funding. Highlighting the prominence that Const 1908, art 11, § 1, should have over funding disputes in the interest of promoting the education of our citizenry, delegate Bledsoe eloquently stated as follows:

> Now, to me, I cannot disassociate the means of education from libraries. . . .
>
> We must move forward and build libraries, big libraries, big schools, better schools, better libraries if we are to move forward and

26

remove our nation from the position of a second class power in the field of science . . . .  [1 Official Record, Constitutional Convention 1961, pp 830-831.]

Delegate Bledsoe, and countless others who share his views about the critical role education should be given in our society, would undoubtedly be saddened by today's decision and by the story plaintiff tells of a young boy who, according to plaintiff, lives in a city that has no public library.  Some students in the child's class live in the township in which defendant is located and, thus, can borrow books from defendant and complete research and homework assignments with those resources.  The young boy cannot.  Consequently, defendant's refusal to allow nonresidents to borrow books is disadvantaging this child academically.

The majority's decision will permit this story to be repeated endlessly across the state.  For example, in rural areas that cannot afford to maintain their own libraries, there may not be a library for miles and miles around.  If the residents of such an area can manage to reach a library, they must now be prepared to conduct their reading and research endeavors onsite.  This is not what our citizens bargained for, and it is precisely the opposite of what the then-Michigan Governor extolled in 1962.  Speaking to the Michigan Library Association, the Governor encapsulated the challenge facing Michigan to strengthen and expand Michigan libraries so that every person would have full access to this great resource.  Governor Swainson stated:

> Every resident of Michigan is entitled to good library service. It is imperative, therefore, that we continue our strides toward that goal.  Access for everyone to the great funds of knowledge and

information found in our libraries is essential. I cannot overstress the need for it. Our total library resources must be within the reach of everyone. Information and the means to obtain it are vital to our progress if we are to cope with the problems and complexities of today's changing world. An enlightened public is indispensable to the preservation and progress of our democratic society. [Governor John B. Swainson, *Library Service to the People of Michigan: Goals, Status, Progress*, Michigan Library Association District Meetings 1962.

On May 1, 1963, shortly before our 1963 Constitution was ratified, United States Supreme Court Justice William J. Brennan, Jr., honored Law Day at the 75th anniversary of the Newark (New Jersey) Public Library. Justice Brennan explained that it was "most appropriate, and a most happy coincidence for [him], that the Library – so much an institution which has long been a staunch pillar of freedom, should celebrate its birthday on the very day which the Nation sets aside for recognition of the Rule of Law and its contributions to liberty." Brennan, *Law, liberty & libraries*, 88 Library J 2417, 2417 (1963). His speech eloquently cataloged the irreplaceable value libraries have in a free and educated society. Like me and scores of others, Justice Brennan understood that "[o]ne of the liberties we Americans prize most highly is our freedom to read what we wish and when we wish." *Id.* at 2418.

While the doors of Michigan libraries remain physically open, the majority tramples the intent of our people by misinterpreting the law to the severe disadvantage of those who wish to educate themselves. As plaintiff queried, "Given the universal understanding that our libraries and their books exist to help us become better educated and more successful and informed citizens, one

28

wonders why defendant seeks to make the books of our public libraries less available to the people, not more." One wonders this same thing about the majority.

Milton E. Higgs, one of 144 candidates elected to serve as a delegate to the Michigan constitutional convention, is no less emphatic today than he was 45 years ago that the purpose of the constitutional amendment was to fully open public libraries to the citizens regardless of residency, and that this included the right to borrow books. Mr. Higgs states:

> [T]he delegates considered and understood the impact of clear and unambiguous words being imbedded in the Constitution which would, as a matter of law, be binding on the Legislature and the Courts prohibiting abrogation of the right of all residents of this State pursuant to reasonable regulations to have access and borrow books from any "public" library in the spirit of ANDREW CARNEGIE who said, "THERE IS NOT SUCH A CRADLE OF DEMOCRACY UPON THE EARTH AS THE FREE PUBLIC LIBRARY, THIS REPUBLIC OF LETTERS, WHERE NEITHER RANK, OFFICE, NOR WEALTH RECEIVES THE SLIGHTEST CONSIDERATION." [Affidavit of Milton E. Higgs, May 25, 2006.]

Michigan citizens are poorer after today's decision. Accordingly, I dissent.[14]

---

[14] Because this issue can be resolved by properly interpreting the constitutional language, I would not reach the questions whether defendant's practices violate plaintiff's rights to due process or equal protection.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

STATE OF MICHIGAN

SUPREME COURT

GEORGE H. GOLDSTONE,

     Plaintiff-Appellant,

v                                     No. 130150

BLOOMFIELD TOWNSHIP PUBLIC
LIBRARY,

     Defendant-Appellee.

_____

WEAVER, J. *(dissenting).*

I concur fully with Justice Cavanagh's dissent, which thoroughly exposes the perversely unrestrained misinterpretation of the phrase "available to all residents of the state" within Const 1963, art 8, § 9 by the majority of four, Chief Justice Taylor and Justices Corrigan, Young, and Markman. The majority's skewed interpretation of that phrase denies all the people of Michigan their constitutional right to full and equal use of libraries.

Libraries are vitally important institutions in a democracy. The people of Michigan adopted a constitutional provision that expressly guarantees that all residents of Michigan have access to libraries. Const 1963, art 8, § 9 states:

> The legislature shall provide by law for the establishment and support of public libraries *which shall be available to all residents of the state* under regulations adopted by the governing bodies thereof. All fines assessed and collected in the several counties, townships and cities for any breach of the penal laws shall be exclusively

applied to the support of such public libraries, and county law libraries as provided by law. [Emphasis added.]

Thomas Jefferson stated, in notably similar language to Const 1963, art 8, § 9:

I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county, to consist of a few well chosen books, to be lent to the people of the country under such regulations as would secure their safe return in due time. [Letter from Thomas Jefferson to John Wyche, May 19, 1809.]

A learned public is essential to a democracy. In explaining the importance of the availability of books, Thomas Jefferson further stated:

Books constitute capital. A library book lasts as long as a house, for hundreds of years. It is not then an article of mere consumption but fairly of capital, and often in the case of professional men, setting out in life, it is their only capital. [Letter from Thomas Jefferson to former President James Madison, Sept. 16, 1821.]

Libraries ensure that information is available to all people, not only to the privileged. An essential function of a library is to provide the public with equitable access to information. The people of Michigan, through the Michigan Constitution, have declared that equitable access to libraries is something that they desire as a society to promote a democratic government in Michigan. The Michigan Constitution of 1908 stated that a library should be established in every township in Michigan. Const 1908, art 11, § 14. This goal proved to be financially unfeasible, especially for many of the small townships, and the constitutional provision was never strictly enforced. When the 1963 constitution was being

2

drafted, due concern was given to the importance of constitutionally established libraries and their importance to the people of Michigan.

The key to the proper and restrained interpretation of "available to all residents of the state" by this Court is to determine what the ratifiers of the constitution, the people, believed "shall be available to all residents of the state" meant when they agreed to give up their right to a library guaranteed in every township under the old constitution. As Justice Cavanagh aptly points out, the people of Michigan believed (as indicated by the common understanding of "available to all residents of the state" and by the extensive, thorough constitutional convention debates) that they were giving up their constitutional right to have a library in every township because they were corollarily ensuring access to libraries to all residents of the state. However the majority of four admits that its decision today leaves entire pockets of the Michigan community without access to any library whatsoever.[1] The majority of four's decision today is not only unconstitutional, it also lacks common sense.

_____

[1] *Ante* at 12. The majority states:

> Indeed, it appears from statistics offered by the Michigan Department of History, Arts, and Libraries that less than 1/5 of 1 percent of the population of Michigan does not have a public library available either directly through their communities or through a cooperative agreement.[10]

_____

(continued…)

The majority of four's unrestrained and mistaken decision directly contradicts the intent of the ratifiers of the constitution and is unconstitutional because it divests the people of Michigan of their constitutionally promised right to full access to libraries.

The decision today is another example of the majority of four's misuse of the power of interpretation to create policy and law, taking away the rights of the people of Michigan and denying them justice in this Supreme Court. It is yet another example of judicial activism by the majority of four. See also *Herald Co v Eastern Michigan Univ Bd of Regents*, 475 Mich 463; 719 NW2d 19 (2006) (eroding rights under the Michigan Freedom of Information Act); *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004) (reducing no-fault insurance rights); *Maldonado v Ford Motor Co*, 476 Mich 372; 719 NW2d 809 (2006) (preventing trial by jury); *Gilbert v DaimlerChrysler Corp*, 470 Mich 749; 685

(…continued)

[10] The department asserts that there are only 21 townships in Michigan with a population totaling 17,055 that do not have a library and that do not contract with another city or township for library services. Inexplicably, the department does not indicate how many cities are similarly lacking. Although we cannot imagine that this figure is very high, Bloomfield Hills obviously is one such city.

The majority admits that all the residents of the city of Bloomfield Hills will be left without library access, and further admits that there may be similarly situated residents across the state who will also be divested of their library access. Inexplicably, the majority brushes off the impact on these residents and cavalierly

(continued…)

4

NW2d 391 (2004) (overturning accountability for sexual harassment in the workplace); and *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich ___; __ NW2d ___ (Docket Nos. 130802, 130803, decided July 25, 2007) (reducing the rights of every citizen to protect the environment by suit under the Michigan Environmental Protection Act).

Elizabeth A. Weaver

---

(…continued)
continues to proclaim that the majority opinion upholds the constitutional mandate to ensure that libraries "shall be available to all residents of the state."

5